UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

ATTORNEYS LIABILITY          )
PROTECTION SOCIETY, INC.,    )
A Risk Retention Group,      )
     *Plaintiff*          )
                          )
v.                           )    Docket No. 1:11-cv-00563-JL
                          )
WHITTINGTON LAW ASSOCIATES,  )
PLLC; W.E. "NED" WHITTINGTON; )
LEDYARD NATIONAL BANK,       )
     *Defendants*         )

## MEMORANDUM IN SUPPORT OF ALPS'S
## MOTION FOR SUMMARY JUDGMENT

     This insurance-coverage case arises from a dispute between a bank and one of its customers. Both the bank and the customer, New Hampshire lawyer Ned Whittington, were tricked by an e-mail scammer who convinced Whittington to present a fraudulent check to the bank, and then to instruct the bank to wire funds to the scammer's account in Japan. The bank and Whittington now disagree about which of them should be financially responsible for the loss of the funds.

     Whittington seeks to have his lawyer's professional liability insurance policy, issued by plaintiff Attorneys' Liability Protection Society ("ALPS"), provide coverage for the loss. But as explained below, under the plain and unambiguous terms of the ALPS policy, there is no coverage. The dispute with the bank does not involve anything Whittington did or failed to do as a lawyer for any client—indeed, he never had a client. For this reason alone, under the express terms of the policy, the dispute is not covered. Further, the case arises from the scammer's misappropriation of funds, and it involves a claim by the bank for reimbursement of those funds; these two additional characteristics

likewise place the dispute outside the ALPS policy's coverage.

The essential facts material to the coverage issues are undisputed, and the policy language is clear. Accordingly, ALPS is entitled to summary judgment, declaring that it has no obligation to defend or indemnify Whittington in the dispute with the bank.

### **Background Facts**[1]

#### 1.      **Whittington**

Ned Whittington has been practicing law for 36 years. Since 2002, he has had a solo practice in Hanover, New Hampshire, under the name Whittington Law Associates PLLC. He mainly handles civil litigation matters, and also does some intellectual-property and other transactional work.[2]

#### 2.      **The E-Mail Scam**

On Sunday, July 24, 2011, at 10:28 p.m., an internet scammer, posing as a Virginia attorney named Richard Downey, sent Whittington an e-mail claiming that he, "Downey," wished to "send[] a client over for a business litigation matter." The e-mailer asked Whittington to "advise of your availability, and I will have my client contact you directly."[3]

Whittington did not immediately respond to the message. The following night, at 2:58 a.m., the scammer sent an identical message, also purporting to be from Downey,

---

[1] ALPS provides the following background facts before giving, at pp. 9 *et seq.*, the concise statement of undisputed material facts required under Local Rule 7.2(b)(1).

[2] Deposition of Whittington, **Exhibit A** hereto, at 7-20.

[3] 07/24/11 "Downey" E-Mail, **Deposition Exhibit 1**, filed herewith; *and see* **Exhibit A** at 22-23. "Downey" added that he was "about to go into the Hospital for Special Surgery for a full knee replacement on Wednesday July 27th, 2011," and would be "completely down for three weeks and extra one week [*sic*] of rehab"—and thus, presumably, difficult for Whittington to contact by telephone. **Deposition Exhibit 1**.

though with a different sender's e-mail address.[4] The next morning, Tuesday, July 26, Whittington responded to the first of the two e-mails, saying that yes, he was available to take on the proposed matter.[5] On Wednesday, July 27, Whittington saw the second "Downey" message, and re-sent his initial response.[6] Neither the duplicate messages, nor the awkward prose of "Downey"'s e-mails, caused Whittington to suspect anything unusual.[7]

The scammer, continuing to correspond with Whittington from two different e-mail addresses (perhaps without realizing he was doing so), again sent two nearly identical messages to Whittington, one on August 1, in which "Downey" introduced his client contact as "Martin Joachim," of a company called "Bendtsteel," in Frederiksvaerk, Denmark; and the other on August 4—from the other "Downey" e-mail address—referencing the contact as "Albert Lund" of Bendtsteel.[8] Whittington soon received a message purporting to come directly from Mr. "Joachim," who identified himself as Bendtsteel's "Director of International Marketing."[9]

"Joachim" e-mailed again on August 8 with more details about the supposed collection matter for which Whittington was to be retained.[10] He explained that Bendtsteel was owed money "for goods supplied to Mill Steel Supply," a Manchester,

---

[4] 07/26/11 "Downey" E-Mail, **Deposition Exhibit 2**.

[5] 07/26/11 Whittington E-Mail, **Deposition Exhibit 3**.

[6] 07/27/11 Whittington E-Mail, **Deposition Exhibit 4**.

[7] *See* **Exhibit A** at 28-29.

[8] 08/01/11 "Downey" E-Mail, **Deposition Exhibit 5**; 08/04/11 "Downey" E-Mail, **Deposition Exhibit 6**.

[9] 08/03/11 "Joachim" E-Mail, **Deposition Exhibit 7**. Two days later, Whittington received an identical message from "Lund," Bendtsteel's "General Sales Manager." **Deposition Exhibit 8**. Again, Whittington found nothing suspicious in these duplicate messages, and continued to respond that he was available and interested in assisting Bendtsteel. *See* **Deposition Exhibit 9**.

[10] 08/08/11 "Joachim" E-Mail, **Deposition Exhibit 10**.

New Hampshire company. The total contract price, "Joachim" explained, was $885,790, and the "[d]ue date for payment was set for the 21st April, 2011 as stipulated in our sales contract." But "Mill Steel" had made only a partial payment, and an agreed-upon extension had passed without delivery of the outstanding balance of over $500,000. Nonetheless, "Joachim" wrote, "we have had a good relationship with our customer," and "we still want to maintain the relationship after collection of the funds owed to us."[11] "Our expectation of your services for now will be within the scenario of a phone call or demand letter to our customer," "Joachim" told Whittington. "When all available options have been exhausted, litigation may be introduced as a last resort."[12]

Whittington asked his staff to run a conflicts check, and he himself did some internet searching for information about Bendtsteel and Mill Steel Supply. He recalls finding a website at "bendtsteel.com" which seemed to depict a legitimate Danish company in the shipbuilding industry.[13] In fact, however, the domain name "bendtsteel.com" had been registered for the first time just weeks before, on July 18, 2011, by someone in Toronto, Canada. The account has since been suspended.[14]

Whittington searched the on-line records of the New Hampshire Secretary of State for information about Mill Steel Supply. The Secretary has no record of a current or former company with that name, though it lists a "Mill Steel Corporation" with the same Manchester address as the one given to Whittington by "Joachim." The records indicate that Mill Steel operates a "wholesale and retail distribution and manufacturing center for

---

[11] **Deposition Exhibit 10**.
[12] **Deposition Exhibit 10**.
[13] **Exhibit A** at 34-35.
[14] See Registration Details, **Exhibit B** hereto.

all types of steel and metal products."[15] After some further internet searching,

Whittington concluded that the discrepancy between the name provided by "Joachim"

and the name on record was probably a case of Mill Steel's using multiple similar names.

He reported this to "Joachim" in an August 9 e-mail.[16]

Whittington sent "Joachim" an engagement letter. The letter asked that Bendtsteel

wire Whittington a $2,000 retainer, which would have to be increased to $10,000 in the

event it was necessary to file suit against Mill Steel.[17] No retainer was ever provided.

"Joachim" did, however, sign and returned the engagement letter, on August 16. He also

reported that, after having been "notified of our intention to retain legal services," Mill

Steel had promised to make payment.[18]

Whittington asked "Joachim" for a copy of Bendtsteel's sales agreement, along

with "payment information, and any correspondence between the parties including the

lengthy negotiations which resulted in the extension." Whittington also asked whether

Mill Steel was "merely a company in financial distress or do they have a claimed reason

for not paying the balance?"[19]

"Joachim" responded to only one of these requests by Whittington: In an August

26 e-mail, "Joachim" sent a copy of the "sales agreement" between Bendtsteel and Mill

Steel.[20] The three-page document described a sale from Bendtsteel to Mill Steel of

various raw materials and products described as "Automat System," "Power Plants," and

---

[15] *See* Registration Details, **Exhibit C** hereto.
[16] 08/09/11 Whittington E-Mail, **Deposition Exhibit 11**; *and see* **Exhibit A** at 39-42.
[17] 08/09/11 Engagement Letter, **Deposition Exhibit 13**.
[18] 08/16/11 "Joachim" E-Mail, **Deposition Exhibit 12**.
[19] **Deposition Exhibit 11**.
[20] 08/26/11 "Joachim" E-Mail, **Deposition Exhibit 14**; "Sales Agreement," **Deposition Exhibit 15**.

"Boiler Plants."[21] In some places, the document suggested that Bendtsteel had already

delivered the goods, which had been inspected and accepted by Mill Steel, and that

Bendtsteel had received full payment.[22] But elsewhere the document said that Mill Steel

would at some time in the future "pick up the Goods from Seller's location of

business"—in Denmark—and that payment would be due once the goods were

transferred for shipment.[23] Whittington says that he scanned the agreement only briefly,

and was satisfied that it made sense for Bendtsteel, a Danish shipbuilding company, to be

selling materials and products of the sort described, to Mill Steel, a New Hampshire

metal manufacturer.[24]

In his August 26 e-mail "Joachim" again reported that Mill Steel was eager to

resolve the matter: "We have been alerted by our debtor that they have made a part

payment to you/your firm to avoid litigation."[25] And indeed, on Wednesday, August 31,

Whittington received a UPS Express package containing a check payable to his firm. The

package's return address identified the sender as "Kevin Saka" of "Exinus" in Niagara

Falls, Ontario—a detail Whittington failed to notice at the time. The check purported to

be an Official Check issued by CitiBank Investment Services, N.A. on behalf of Mill

Steel Supply, in the amount of $195,790. It was accompanied by a document entitled

"Invoice," which itemized and gave unit prices for the materials and goods supposedly

sold by Bendtsteel to Mill Steel.[26] Whittington again found nothing suspicious about this

---

[21] *See* **Deposition Exhibit 15**, § 1.

[22] *See id.*, §§ 2, 8.

[23] *See id.*, §§ 2, 3, 4, 11.

[24] *See* **Exhibit A** at 51-52.

[25] **Deposition Exhibit 14**.

[26] Contents of Package, **Deposition Exhibit 16**; *see* Invoice at p. W 49 (2,098 "Stainless steel" at $94 each; 1,000 "Structural steel" at $105.74 each; 228 "Power

document, though he did recognize that it was unusual for a buyer to issue an "invoice"

to a seller, as he commented in an e-mail to "Joachim."[27]

Whittington directed his bookkeeper to deposit the "Mill Steel" check in his

client-funds (IOLTA) account. Unbeknownst to Whittington, the bookkeeper failed to

deposit the check that day, August 31; she waited until she was on her way home from

work the following afternoon, Thursday, September 1, and then stopped at the Lyme,

New Hampshire branch of Ledyard Bank to make the deposit, shortly after 2:15 p.m.[28]

By this time, Whittington had been instructed by "Joachim", in an e-mail at 1:05

p.m. on Thursday, to "please ask your bank to transfer by swift to our creditor MS CAR

FACTORY COMPANY LTD in CHIBA-KEN, JAPAN the sum of $188,978.00."[29]

Whittington says that he found nothing unusual in this request, assuming that an

international company such as Bendtsteel might well have such a creditor in Japan.[30] He

promptly contacted the bank, but was told that it would be impossible to wire funds until

the following day, Friday, September 2.[31] Nonetheless, Whittington asked the bank to

complete the necessary wire-transfer request form, and went in person to the bank's

Hanover branch, across the street from his office, to sign the form, at some point during

the afternoon of September 1.[32]

---

Plants" at $550 each; 596 "Boiler Plants" at $320 each; 100 "Flat Carbon Steel and Long
steel" at $616.50 each).

[27] 08/31/11 Whittington E-Mail, **Deposition Exhibit 17**; *and see* **Exhibit A** at 54-56.

[28] Exhibit A at 58-59, 62, 86-87; Deposit Slip, **Deposition Exhibit 21**.

[29] 09/01/11 "Joachim" E-Mail, **Deposition Exhibit 19**.

[30] *See* **Exhibit A** at 57.

[31] 09/01/11 Whittington E-Mail, **Deposition Exhibit 20**.

[32] Request for Foreign Wire Transfer, **Deposition Exhibit 22**; **Exhibit A** at 60-62.
Whittington says that before he signed the wire request form, he asked the bank's
representatives—Gail Trottier and Linda Brown—to assure him that the check he had

Ledyard attempted to make the requested wire transfer to Japan on Friday, September 2, as promised, but the bank made an error in one of the necessary account numbers. On Tuesday morning, September 6—after the long Labor Day weekend—Whittington received an e-mail from "Joachim" reporting that the wire had not gone through.[33] The error was discovered and corrected, and the wire was completed by the afternoon of September 6.[34] Several hours later, at 7:00 p.m., Ledyard received notification by fax that CitiBank was unable to locate the account identified on the check Whittington had deposited.[35] The next morning, Ledyard notified Whittington of the problem.[36]

The bank attempted to recall the wire transfer, but without success. Subsequent investigation confirmed that the check was fraudulent. "Downey," "Joachim," and "Lund" all proved to be fake identities. Whittington and Ledyard discovered that they had been the victims of a common e-mail fraud scheme, one that has been a subject of attention and publicity by, for example, the FBI-sponsored Internet Crime Complaint Center, and authorities in New Hampshire and other states.[37]

Ledyard debited the full amount of the wire transfer against the IOLTA account into which Whittington's bookkeeper had deposited the fraudulent check; the account had previously had a balance of approximately $19,000. The bank then filed suit against

asked his bookkeeper to deposit was "good." According to Whittington, Trottier and Brown responded with an unequivocal "yes"—despite the fact that the check had only been deposited that same afternoon, and at a different branch. **Exhibit A** at 83-88.

[33] 09/06/11 "Joachim" E-Mail, **Deposition Exhibit 27**.

[34] 09/06/11 Gail Trottier E-Mail, **Deposition Exhibit 28**.

[35] Large-Dollar Return Notification, **Deposition Exhibit 29**.

[36] 09/07/11 Trottier E-Mail, **Deposition Exhibit 30**.

[37] *See* **Deposition Exhibits 31, 32** (statements by Whittington about scam). *And see* 07/15/10 NH Attorney General Alert, **Exhibit D** hereto; 03/12/12 Internet Crime Complaint Center Press Release, **Exhibit E** hereto.

Whittington in New Hampshire state court on or about November 7, 2011, to recover the remainder of the lost funds.[38]

## Concise Statement of Material Facts

### A. Ledyard's Complaint

1.      Count I of the bank's complaint is captioned "Breach of Contract." The gist of this claim is that Ledyard's relationship with Whittington was governed by a written Deposit Account Agreement, under the terms of which, where a depositor presents a check to the bank, as Whittington did in this case; where the depositor then, on the basis of having deposited the check, seeks to withdraw funds from the bank, as Whittington did in requesting the wire transfer to Japan; and where the bank permits the withdrawal and then later learns that the deposited check was invalid, as happened here, the bank has the right to recover from the depositor—here Whittington and/or his firm— the amount withdrawn.[39]

2.      In Count II, entitled "Breach of Uniform Commercial Code Transfer Warranties Pursuant to RSA 382-A," the bank claims that when Whittington and his firm presented and deposited the check, they impliedly "warranted that they were entitled to enforce the instrument; that the instrument was authentic and authorized; and that the instrument had not been altered." Ledyard contends that under the UCC, the bank's wire delivery of funds to Japan was "provisional" and subject to Ledyard's right to recover the withdrawn funds from Whittington and his firm.[40]

---

[38] Ledyard Complaint, **Deposition Exhibit 33**.
[39] *Id.*, ¶¶ 19-22.
[40] *Id.*, ¶¶ 23-27 (citing N.H.R.S.A. 382-A:3-416, 4-201, 4-207, 4-210 and 4-214).

3.      In Counts III and IV of Ledyard's complaint, the bank claims that Whittington acted negligently in failing to heed the suspicious circumstances surrounding the delivery of the check to him, and the request for transfer of funds to Japan, and that Whittington's negligence caused harm to the bank.[41]

## B. The ALPS Policy

4.      Whittington has sought coverage for Ledyard's action under his 2011 professional liability insurance policy issued by ALPS (Policy No. 7704-8; "the ALPS policy" or "the Policy"). The Policy provides, in relevant part, that under certain conditions ALPS will pay on behalf of an insured "sums... that the Insured becomes legally obligated to pay as damages."[42] The "damages" must, however, arise from "an act, error or omission in professional services that were or should have been rendered by the Insured."[43]

5.      "Professional services" is defined by the Policy, in relevant part, as "services or activities performed for others as an attorney in an attorney-client relationship on behalf of one or more clients."[44] As a related matter, the Policy further provides that it does not apply to any claim arising from or in connection with "any obligation assumed by contract, other than an obligation to perform professional services."[45]

---

[41] *Id.*, ¶¶ 28-38.
[42] Policy, **Exhibit F** hereto, ¶ 1.1. ALPS has "the right and the duty to defend" a claim that is covered under the Policy, but no such right or duty with respect to a non-covered claim. *Id.*, ¶ 1.2.1.
[43] *Id.*, ¶ 1.1.1.
[44] *Id.*, ¶ 2.22.1.
[45] *Id.*, ¶ 3.1.14.

6.     Further, as noted, the Policy only provides coverage for claims of "damages." The definition of "damages" in the Policy specifically does not include "restitution, reduction, disgorgement or set-off" of any "funds or property presently or formerly held by an Insured."[46]

7.     The Policy provides that it "does not apply to any claim arising from or in connection with... [a]ny conversion [or] misappropriation... by any person of client or trust account funds or property, or funds or property of any other person held or controlled by an Insured in any capacity or under any authority."[47]

8.     The Policy also elsewhere specifically excludes "any claim that seeks, whether directly or indirectly, the return, reimbursement or disgorgement of... funds or property held by an Insured."[48]

## Present Status of Ledyard Suit

Ledyard's suit against Whittington has been stayed pending the outcome of this coverage matter. Before the stay, in a January 24, 2012 decision, a state court judge granted a motion by Whittington seeking to dissolve pre-judgment attachments against his personal assets, while leaving in place (with his consent) attachments against his law firm's assets.[49]

The court found no reasonable likelihood that Ledyard would be able to establish any of its claims against Whittington personally. Ledyard had been unable to produce a signed copy of the Deposit Account Agreement on which Count I was based; further, the

---

[46] *Id.*, ¶ 2.6.
[47] *Id.*, ¶ 3.1.13.
[48] *Id.*, ¶ 3.1.15.
[49] State Court Decision, **Deposition Exhibit 34**.

court concluded, Whittington likely signed the agreement as agent for his firm, not in his

personal capacity.[50] Counts III and IV were deficient, in the court's view, in that there

was clearly never an attorney-client relationship between Whittington and the bank, and

thus no duty owed to protect the bank's interests. Further, Ledyard had failed to offer the

expert testimony that would be necessary to support any claim that Whittington violated

an applicable standard of care. Indeed, for these same reasons, the court appeared to

believe that of the claims against the law firm, only the claim for breach of the U.C.C.

presentment warranties was viable.[51]

## **Argument**

**I.    Background Principles**

The governing law in this diversity case is that of New Hampshire, the state

where Whittington's practice is based and thus "the principal location of the insured

risk."[52] Under New Hampshire law, as in other jurisdictions, interpretation of the

language of an insurance policy is a matter of law for decision by a court.[53] Insurance

policies are subject to the same general rules of construction and interpretation as apply

to other contracts.[54] The court takes the plain and ordinary meaning of the policy's words

---

[50] *Id.* at 2-3.
[51] *Id.* at 3-7.
[52] *E.g., Marston v. U.S. Fid. & Guar. Co.*, 135 N.H. 706, 711 (1992).
[53] *E.g., Preferred Nat. Ins. Co. v. Docusource, Inc.*, 149 N.H. 759 (2003).
[54] *See Tech-Built 153, Inc. v. Virginia Sur. Co., Inc.*, 153 N.H. 371, 373 (2006) ("The fundamental goal of interpreting an insurance policy, as in all contracts, is to carry out the intent of the contracting parties" (citing *Coakley v. Maine Bonding & Cas. Co.,* 136 N.H. 402, 409 (1992))); *Energynorth Natural Gas, Inc. v. Cont'l Ins. Co.*, 146 N.H. 156, 159 (2001) ("We generally construe an insurance policy as we do any other contract."); *Windham Envtl. Corp. v. U.S. Fid. & Guar. Co.*, 2008 WL 4534086 (D.N.H. Sept. 29, 2008) ("Under New Hampshire law an insurance contract is to be construed like any contract.").

in context, and construes the words objectively, as would a reasonable person in the position of the insured, reading the policy as a whole and in more than a casual manner.[55]

An insurance company is, like any other contracting party, free to limit its liability through clear and unambiguous policy language.[56] Where the meaning of a policy is unambiguous, a court's obligation is to enforce the policy as written, according to its natural and ordinary meaning. "[A]bsent ambiguity, our search for the parties' intent is limited to the words of the policy."[57] Thus, when dealing with an unambiguous policy provision a court need not be concerned with what an insured might have "expected" his policy to cover. Similarly, if there is no ambiguity, then the rule that ambiguous terms will be construed against the insurer as the drafter of the policy has no bearing on the case.[58]

Further, an ambiguity in policy language does not arise simply because the insured disagrees with the insurer about the meaning or application of a provision. Rather, as with other contracts, the provision must on its face be objectively susceptible to two different and equally plausible meanings.[59] A court cannot "create an ambiguity...

---

[55] *E.g., Preferred Nat. Ins. Co. v. Docusource, Inc.*, 149 N.H. at 763.

[56] *Id.*

[57] *Colony Ins. Co. v. Dover Indoor Climbing Gym*, 158 N.H. 628, 630 (2009) (citations omitted).

[58] *Niedzielski v. St. Paul Fire & Marine Ins. Co.*, 134 N.H. 141 (1991); *Colony Ins. Co. v. Dover Indoor Climbing Gym*, 158 N.H. at 630-31 ("Where, however, the policy language is clear, this court "will not perform amazing feats of linguistic gymnastics to find a purported ambiguity" simply to construe the policy against the insurer and create coverage where it is clear that none was intended." (quoting *Hudson v. Farm Family Mut. Ins. Co.,* 142 N.H. 144, 147 (1997))); *Funai v. Metro. Prop. & Cas. Co.*, 145 N.H. 642, 644 (2000) ("While we construe insurance policies in favor of the insured when the policy is ambiguous, we will not force an ambiguity simply to resolve it against an insurance company.").

[59] *Whitcomb v. Peerless Ins. Co.*, 141 N.H. 149, 151 (1996); *Energynorth Natural Gas, Inc. v. Cont'l Ins. Co.*, supra, 146 N.H. at 159 (policy language is ambiguous only

in order to resolve it against the insurer," or "to create coverage where it is clear that none was intended."[60]

> An insurer's duty to defend its insured in a lawsuit such as the bank's against Whittington is determined by examining the complaint to see whether any claim—that is, any claim supported by sufficient factual allegations—would fall within the coverage afforded by the policy. The "legal nomenclature the plaintiff uses to frame the suit is relatively unimportant" to the coverage determination, which must "avoid permitting the pleading strategies, whims and vagaries of third-party claimants to control the rights of parties to an insurance contract."[61] Where a court determines that a claim by a plaintiff "arise[s] entirely out of an act that would not be covered under an insurance policy," then it follows that a different legal claim based on the same predicate act "is not one that would be covered under the policy either."[62]

> Finally, because the duty to defend is broader than the duty to indemnify, if a court concludes that an insurer has no duty to defend because the claims fall outside the policy's coverage, then by definition there can be no duty to indemnify.[63]

---

where "the language of the policy reasonably may be interpreted more than one way" (quoting *High Country Associates v. New Hampshire Ins. Co.*, 139 N.H. 39, 41 (1994))).

[60] *Niedzielski v. St. Paul Fire & Marine Ins. Co.*, 134 N.H. at 147.

[61] *Insight Technology, Inc. v. Wausau Bus. Ins. Co.*, 2005 WL 3466644, *4 (D.N.H.) (quoting *Titan Holdings Syndicate, Inc. v. City of Keene*, 898 F.2d 265, 271 (1st Cir. 1990) (applying New Hampshire law)); *Ross v. Home Ins. Co.*, 146 N.H. 468, 471 (2001) (quoting *M. Mooney Corp. v. U.S. Fidelity & Guaranty Co.*, 136 N.H. 463, 469 (1992)).

[62] *Ross v. The Home Ins. Co.*, 146 N.H. at 472. *Accord, Preferred National Ins. Co. v. Docusearch, Inc.*, 149 N.H. 759 (2003).

[63] *Ross v. Home Ins. Co.*, 146 N.H. at 473; *Winnacunnet Co-op. Sch. Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 84 F.3d 32, 36 (1st Cir. 1996) (applying New Hampshire law).

## II.   Ledyard's lawsuit does not arise from any act, error, or omission by Whittington in performing professional services as an attorney for a client

Under the "professional services" requirement of the ALPS policy, and the related policy provisions also quoted above, a covered claim against an insured attorney must involve [1] "an act, error or omission" by the insured [2] in services "that were or should have been rendered" [3] "for others as an attorney" [4] "in an attorney-client relationship" [5] "on behalf of one or more clients; and the claim cannot involve [6] an "obligation assumed by contract, other than an obligation to perform professional services."[64]

Ledyard's claims against Whittington do not meet these requirements for coverage. To begin with, Whittington simply did not have an attorney-client relationship with any actual client, as the Policy requires. The story that someone named "Martin Joachim" was a representative of a company called "Bendtsteel," and that Bendtsteel wished to retain Whittington to assist with a collection dispute with "Mill Steel," proved to be a tissue of pure fiction, and a pretext for a scam. In the absence of an actual existing client and an actual attorney-client relationship, the ALPS policy does not apply.

Second, it is clear that Ledyard's claims in no way "arise from or in connection with" any act, error or omission in Whittington's performance of, or failure to perform, any services as an attorney. The acts of Whittington from which the bank's claims arise are the presentment and deposit of the "Mill Steel" check, and the arranging of the wire transfer to Japan. Nothing in the bank's complaint against Whittington suggests that he failed to properly perform his job as lawyer for his putative client "Bendsteel." Rather,

---

[64] **Exhibit F**, ¶¶ 1.1.1, 2.22.1, 3.1.14.

the lawsuit arises from the commercial relationship between Whittington and Ledyard as customer and bank; from the legal obligations to a bank assertedly owed by any depositor, whether lawyer or layperson, when depositing and seeking to draw against a check; and from Ledyard's and Whittington's joint involvement as victims in a confidence-scam, variations of which regularly ensnare non-lawyers and lawyers alike.

Several other courts have persuasively held, in cases very similar to this one, that disputes between banks and lawyers who fell prey to such e-mail scams are not covered under lawyers' professional liability policies—and not covered for exactly the reason just articulated: that the claims do not arise from the lawyer's performance of professional services as an attorney.

Most notably, a South Carolina federal district court reached this conclusion in a nearly identical check-scam case, involving another ALPS-insured attorney and the exact policy language at issue here. The court concluded that the ALPS policy's "professional services" language is unambiguous, and plainly requires that in the matter for which coverage is sought, there must have in fact existed "one or more clients," and "an attorney-client relationship."[65]

In the South Carolina case, as here, the lawyer's putative client was a fiction created by an e-mail scammer; the scammer himself obviously never had any intention of retaining the lawyer or forming an attorney-client relationship. Given the clear absence of any actual client or attorney-client relationship, the South Carolina court held that, as a matter of law, the ALPS policy provided no coverage for the lawyer against a claim by

---

[65] *Bradford & Bradford, P.A. v. ALPS*, 2010 WL 4225907 (D.S.C.)

his bank to recover fraudulently-obtained funds.[66] As the court observed, this result is consistent with the fundamental purpose of a lawyer's professional liability policy, which is "to protect the insured as to claims based on acts or omissions by the insured acting as an attorney for a client, not from scams perpetrated by persons pretending to be clients to defraud the insured."[67]

Similarly, in *Fleet Nat'l Bank v. Wolsky*,[68] a Massachusetts lawyer sought coverage under his professional liability policy after he fell for an e-mail scam nearly identical to the one in this case, and was sued by his bank. The lawyer's insurer, which was named as a third-party defendant after it denied coverage, argued at summary judgment that the bank's claims against the lawyer did not involve his acts or omissions in rendering or failing to render "legal services," the term used in that insurer's policy. The court agreed, holding that the conduct by the lawyer at issue—"the receipt, indorsement, and deposit of a check, and the distribution of funds"—could not be considered legal (or "professional") services. These terms, the court reasoned, must be understood to refer only to services that specifically "require a lawyer's specialized knowledge, labor, or skill." Here, by contrast, the attorney "was merely an essential pawn in an elaborate fraudulent check scheme, a role which did not call upon his professional skills but rather required [the lawyer's] blind trust to act as a facilitator to convert a check to cash." Therefore, the policy provided no coverage as a matter of law.[69]

A Georgia court reached the same conclusion in *Fidelity Bank v. Stapleton*.[70] A

---

[66] *Id.* at *5.
[67] *Id.* at *6 n.10.
[68] Case No. 04-CV-5075 (Mass.Super.Ct. Dec. 6, 2006), **Exhibit G** hereto.
[69] *Id.* at 6.
[70] Case No. 07A-11482-2 (Ga.Super.Ct. Jan. 14, 2009); **Exhibit H** hereto.

lawyer succumbed to the same e-mail scam, deposited a check for $198,000 in his

IOLTA account, and then wired funds overseas, leading to a suit by his bank after the

original check was dishonored. Granting the insurer's motion for summary judgment on

the coverage issue, the court held that the bank's claim against the lawyer did not arise

from his "professional services," as the policy required.[71]

     While no New Hampshire court has yet had occasion to address either the specific

scope of "professional services" under the ALPS Policy or a dispute over coverage in an

e-mail-scam case, there are instructive New Hampshire decisions applying "professional

services" policy provisions in other contexts.

     As the New Hampshire courts have emphasized, "the question of professional

liability coverage is determined not by the professional status of the actor, but by the

nature of the tortious act" or other conduct by the defendant lawyer that gives rise to the

claim.[72] The claim must involve services by the insured that are particular to his

profession, and involve the "specialized knowledge" and "predominantly mental or

intellectual" skills particular to that profession.[73]

     As another judge of this District Court observed at the outset of a decision

construing the phrase "only while performing legal services" in a credit-union bond, "the

term 'legal services' cannot be construed to cover anything and everything a retained

attorney might do. If the term were so defined, the limitation 'only while performing

legal services' would impose no limitation at all."[74] The court found the "plain meaning"

---

[71] *Id.* at 4-5.
[72] *Niedzielski v. St. Paul Fire & Marine Ins. Co.*, 134 N.H. at 144.
[73] *Niedzielski, id.*
[74] *Northeast Credit Union v. CUMIS Ins. Soc., Inc.*, 2010 WL 2108296 *3
(D.N.H. 2010) (McAuliffe, C.J.).

of the term "legal services" to be "services that require legal training or experience, and in most cases, licensure."[75] This definition clearly excluded, the court found, services as an escrow agent, even in a case where such services are performed by an attorney and governed by the rules of professional conduct applicable to lawyers.[76]

Likewise, under New Hampshire law there must be more than a mere connection-in-fact between the insured's professional activities and the events giving rise to the claim in order for professional-liability coverage to apply. In *Ross v. The Home Ins. Co.*,[77] the state Supreme Court upheld a summary-judgment ruling that a lawyer's professional liability insurance policy provided no coverage for claims of breach of fiduciary duty and negligent hiring and supervision against the lawyer, where those claims arose from a law firm employee's having summoned a client to the office after hours to sign some papers, and then having raped her in the firm's offices.

The Supreme Court agreed with the motion judge that the circumstances of the crime—the fact that it occurred in the lawyer's office, that it involved a firm employee and a client, and that the victim was lured to the office on the pretext of signing papers related to the lawyer's professional services—did not establish the required connection,

---

[75] *Id.*

[76] *Id.* at *3-4. *Cf. Merchants Mut. Ins. Co. v. City of Concord*, 117 N.H. 482 (1977) (in case involving suicide of jail inmate, insured's alleged negligent failure to seek appropriate medical and psychiatric assistance for inmate involved "professional services" within the meaning of policy, whereas alleged negligent decisionmaking about whether to inform court about the inmate's behavior, and about what supervision to provide—decisions that called upon "no special skills or training" on insured's part—did not arise from any "professional services"). A policy may, of course, be issued to cover more than one "profession." *See, e.g., Weeks v. St. Paul Fire & Marine Ins. Co.*, 140 N.H. 641 (1996) (policy issued to nursing home, providing coverage for "professional services," without further definition or limitation, would not be limited to covering only *medical* professional services).

[77] *Ross v. Home Ins. Co.*, 146 N.H. 468 (2001).

for purposes of potential professional-liability coverage, between the claims against the lawyer and his "rendering or failing to render professional services for others as a lawyer."[78] Nor was the necessary connection supplied by the victim's claims that the lawyer negligently hired and supervised the employee; matters such as "the personnel decisions of a law firm," the Supreme Court observed, "are relative and incidental to the business aspects of the firm, not its professional services."[79]

In the present case, the acts of Whittington from which the bank's claims arise—again, presenting and depositing the "Mill Steel" check and ordering the wire transfer to Japan—were not acts that in any way involved the "specialized knowledge," and "predominantly mental or intellectual" skills particular to the legal profession. They were not acts that required or involved legal training or experience, much less licensure. As with the escrow-agent services at issue in *Northeast Credit Union*, the fact that such activities can be and commonly are performed by lawyers, and the fact that in performing the services (and utilizing his client-funds account) Whittington was governed by the rules of professional conduct, does not transform the actions into professional legal services. Nor, as *Ross* makes clear, is the result altered by the fact that the pretext of legal services was used by the third-party perpetrator as the vehicle for carrying out the crime.

Thus, based on the clear language of the ALPS policy, the decisions of the South Carolina, Georgia and Massachusetts courts in similar e-mail-scam cases, and the decisions of the New Hampshire courts interpreting analogous "professional services"

---

[78] Similarly, in an earlier case, *Niedzielski v. St. Paul Fire & Marine Ins. Co.*, *supra*, the Court held that a claim against a dentist for sexual assault did not arise from his professional services for coverage purposes, even where the assault involved a patient and occurred in the professional's office during the actual performance of professional work.

[79] 146 N.H. at 472-73.

provisions, ALPS is not obliged to defend or indemnify Whittington with respect to the bank's efforts to recover the stolen funds.

To be sure, courts in two other jurisdictions, applying policies issued by insurers other than ALPS with materially different terms, have held that coverage was available to lawyers involved in e-mail scams. But as explained below, the key provisions of the policies at issue in those cases were in marked contrast to those of the ALPS policy. Even leaving aside the clear inconsistency in reasoning between these decisions and the New Hampshire cases treating "professional services" policy limitations, as just described, the differences in policy language alone make the cases readily distinguishable.

In the Eleventh Circuit case *Nardella Chong, P.A. v. Medmarc Cas. Ins. Co.*, the relevant policy defined "professional services" more broadly than does the ALPS policy: the term was defined to include any "services typically and customarily performed by an attorney."[80] The definition did not require, as the ALPS policy does, that the services from which the claim arises have been performed "as an attorney" and "in an attorney-client relationship" and "on behalf of one or more clients." Nor did any principle of (Florida) state law require the court to consider whether the lawyer's conduct in depositing the fraudulent check and arranging for the transfer of funds involved the "specialized knowledge," and "predominantly mental or intellectual" skills, or training or experience of, the legal profession. Unlike in *Northeast Credit Union* and the other cases cited above, it was enough for the court in *Nardella Chong* that the insured had the status of a lawyer, and engaged in activities that, as a matter of custom and practice, lawyers often perform.

---

[80] 642 F.3d 941, 942 (11th Cir. 2011).

Similarly, in the New York case *Lombardi, Walsh, et al. v. American Guar. & Liab. Ins. Co.*, the policy was written to cover services "performed by an Insured as a licensed lawyer in good standing" and services "ordinarily performed as a lawyer." The New York court expressly noted that under this language the services need not have been performed *for a client*. Thus, in the court's view, it was sufficient for coverage purposes that "someone"—the imposter pretending to be a prospective client—*purported* to request the insured law firm's services, and that the firm "was *under the impression* that it was legitimately retained and attempted to perform services as attorneys." "Regardless of whether the imposter qualified as a 'client,'" the court wrote, "the policy does not require an actual 'client'; the policy only requires that [the lawyer] 'render Legal Services for others,' and the imposter fell within that broad category."[81]

Here, again and by contrast, the ALPS policy expressly requires not only the performance of services "as an attorney," but also the existence of an actual "client" and an actual "attorney-client relationship," neither of which were present. Thus, like *Nardella Chong*, the *Lombardi* decision can and should be distinguished not only based on the court's taking a view of what constitutes "professional" services that is much broader than that of the New Hampshire courts, but also based on these key differences in policy terms.

And the policy-language distinctions go still further. As noted above, the ALPS policy also specifically provides that there is no coverage for any claim that arises out of

---

[81] *Lombardi, Walsh, et al. Wakeman, Harrison, Amodeo & Davenport, P.C. v. American Guar. & Liab. Ins. Co.*, 85 A.D.2d 1291 (N.Y. App. Div. 2011) (emphasis added). This decision was followed as "binding" authority by the trial court in *Yudin & Yudin, PLLC v. Liberty International Underwriters, Inc.*, 2012 WL 170978 (N.Y.Sup.Ct. 2012).

or in connection with "any obligation assumed by contract, other than an obligation to perform professional services"[82]—a limitation nowhere evident in the discussion of the policies in *Nardella Chong* or *Lombardi*. Ledyard's complaint against Whittington is *expressly* based upon obligations Whittington's law firm allegedly undertook pursuant to contract—specifically, pursuant to the Deposit Account Agreement, which is obviously not in any respect a contract for professional services.[83] The contractual basis for the bank's claims against Whittington and the ALPS's policy's clear exclusion of contract-based claims provides an additional distinction from the New York and Eleventh Circuit cases, and an additional reason why there can be no coverage here.

### III. Ledyard's claim arises from a misappropriation of funds, further barring coverage

The ALPS Policy separately provides that it "does not apply to any claim arising from or in connection with... [a]ny conversion [or] misappropriation... by any person of client or trust account funds or property, or funds or property of any other person held or controlled by an Insured in any capacity or under any authority."[84] Once again, from the discussion in the cases, neither the policy in the *Nardella Chong* matter nor that in

---

[82] **Exhibit F**, ¶ 3.1.14.

[83] *Cf. Fidelity Bank v. Stapleton*, cited above (agreeing with insurer that the bank's claims against the lawyer there arose from the lawyer's contractual obligations to the bank as a depositor, and thus were excluded from coverage for that reason as well).

[84] **Exhibit F**, ¶ 3.1.13. Such "handling of funds" exclusions are not uncommon in professional liability policies issued to professionals, including lawyers, and have routinely been held unambiguous and fully enforceable. *See, e.g., Global Title, LLC v. St. Paul Fire & Marine Ins. Co.*, 788 F.Supp.2d 453 (E.D.Va. 2011); *Chicago Title Ins. Co. v. Northland Ins. Co.*, 31 So.3d 214 (Dist.Ct.App.Fl. 2010); *Fokken v. Steichen*, 744 N.W.2d 34 (Neb. 2008); *Westport Ins. Corp. v. Hanft & Knight, P.C.*, 523 F.Supp.2d 444 (M.D.Pa. 2007); *Fidel. Nat. Title Ins. Co. of N.Y. v. OHIC Ins. Co.*, 619 S.E.2d 704 (Ct.App.Ga. 2005); *PNA, LLC v. Interstate Ins. Grp.*, 2003 WL 21488120 (E.D.La. 2003); *Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448 (6th Cir. 2003); *Bankers Mult. Line Ins. Co., Inc. v. Pierce*, 20 F.Supp.2d 1004 (S.D.Miss. 1998).

*Lombardi* included any such exclusion.

The Ledyard lawsuit clearly arises from (and/or in connection with) the conversion and misappropriation of funds by the scammer posing as "Joachim." The fact that it was a third party who committed the misappropriation, and not Whittington himself, has no effect on the applicability of the "handling of funds" exclusion, which again makes clear that it applies to misappropriations by "any person."[85] Nor does it matter for this purpose whether the funds misappropriated by "Joachim" are considered to have come from Whittington's IOLTA account (that is, in the language of the exclusion, whether they were "client or trust account funds"), or whether they were funds of the bank over which Whittington asserted "control" by directing the bank to wire the funds. Because the bank's claims arise from a misappropriation of the wired funds, the "handling of funds" exclusion bars coverage as a matter of law.

## IV.    The relief sought by the bank is restitution of the wired funds, not "damages" that would potentially be covered by the Policy

Finally, the ALPS Policy provides coverage only for "sums... that the Insured becomes legally obligated to pay *as damages*." The definition of "damages" in the Policy specifically does not include "restitution, reduction, disgorgement or set-off" of any "funds or property presently or formerly held by an Insured." The Policy also elsewhere specifically excludes "any claim that seeks, whether directly or indirectly, the return, reimbursement or disgorgement of... funds or property held by an Insured."[86]

Ledyard's lawsuit seeks to have Whittington provide restitution and

---

[85] *Id. Cf., e.g., Chicago Title Ins. Co. v. Northland Ins. Co.*, 31 So.3d 214, 216 n.2 (fact that third party rather than insured committed the misappropriation "is of no significance" under language of "handling of funds" exclusion).

[86] **Exhibit F**, ¶¶ 1.1.1, 2.6.

reimbursement of funds of the bank over which, again, Whittington exercised control—that is, "held"—when he presented the "Mill Steel Supply" check and instructed the bank to wire the funds on his behalf. As noted, one of the bank's key claims—indeed, the only claim on which the state court considered that the bank had a chance of success—was the claim based on the Whittington firm's presentment warranties under the U.C.C. The U.C.C. provisions on which the bank relies expressly characterize the rights granted to a bank as the right to "charge back the amount of any credit given... to its customer's account, or obtain refund from its customer...."[87] That is, the bank's U.C.C. claim is by its nature one for return, reimbursement, or disgorgement of funds obtained and used by the insured, not for "damages" within the meaning of the Policy. For this additional reason, there can be no coverage.

## Conclusion

ALPS has no duty under Whittington's lawyer's professional liability policy to provide him with either a defense or indemnity in his dispute with his bank over the loss of the funds transferred in the "Bendtsteel" e-mail scam. Because the language of the ALPS policy is unambiguous in this regard, and the material facts are undisputed, the Court should enter summary judgment declaring that ALPS has no such obligation. Summary judgment should also be entered dismissing Whittington's counterclaims against ALPS.

---

[87] N.H.R.S.A. 382-A:4-214, cited in Ledyard's Complaint, **Deposition Exhibit 34**, at ¶ 39.

*ALPS v. Whittington*
Memo in Support of ALPS's Motion for Summary Judgment
Page 26 of 26

Dated: August 31, 2012

Respectfully submitted,
ATTORNEYS LIABILITY PROTECTION
SOCIETY, INC.
By its attorneys,
SUGARMAN, ROGERS, BARSHAK &
COHEN, P.C.

By:    */s/ William L. Boesch*
William L. Boesch
NH Bar #18511
101 Merrimac Street
Boston, MA 02114-4737
617-227-3030
boesch@srbc.com

## **Certificate of Service**

I hereby certify that on the above date I filed this document via the Court's ECF system, and that I am relying on that system to effect service on counsel for the other parties, all of whom are registered participants.

/s/ William L. Boesch

445819