```
            UNITED STATES DISTRICT COURT
              DISTRICT OF NEW HAMPSHIRE
```

Attorneys Liability Protection
Society, Inc.

    v.                                      Civil No. 11-cv-563-JL
                                            Opinion No. 2013 DNH 091

Whittington Law Associates, PLLC,
W.E. "Ned" Whittington, and
Ledyard National Bank

**MEMORANDUM ORDER**

This dispute over the scope of a professional liability insurance policy arises from a somewhat unusual set of facts, at least as far as professional liability insurance policies are concerned. Whittington Law Associates, PLLC and W.E. Whittington (collectively, the "Whittington defendants") were evidently the victims of what has become known as a "Nigerian Check Scam." In the typical embodiment of that confidence game, "the victim is asked to accept what appears to be a legitimate check on behalf of a foreign corporation, deposit the funds, then wire some or all of the proceeds to a foreign account before the victim's bank realizes the check is, in fact, counterfeit." Branch Banking & Trust Co. v. Witmeyer, No. 10-cv-55, 2011 WL 3297682, at *1 (E.D. Va. Jan. 6, 2011).

That is precisely what happened here. The Whittington defendants were induced, by a "client" that did not actually

exist, to deposit a sizeable check into their account at Ledyard National Bank and promptly wire the bulk of the funds to a bank account in Japan.  By the time Ledyard discovered that the check was invalid, the funds had already been withdrawn from the Japanese account.

Finding itself more than $150,000 short, Ledyard commenced a state-court action against the Whittington defendants to recover that amount.  The Whittington defendants, in turn, sought coverage against that action from their professional liability insurer, Attorneys Liability Protection Society, Inc. ("ALPS"), which responded by filing this action seeking a declaratory judgment that it need not provide coverage.  The Whittington defendants have counterclaimed, seeking a declaratory judgment to the contrary, and alleging that ALPS breached the insurance contract by declining to provide coverage.  This court has jurisdiction of this action under 28 U.S.C. § 1332 (diversity).

ALPS has moved for summary judgment on both its claim and the Whittington defendants' counterclaims.  Its arguments are twofold.  First, pointing out that the Whittington defendants' insurance policy provides coverage only for damages arising from "an act, error or omission in professional services that were or should have been rendered," it argues that the events underlying Ledyard's claim do not meet that definition.  Second, it argues

that even if Ledyard's claim falls within the general scope of the policy, that claim is specifically excluded by the policy's exclusion for the "conversion, misappropriation or improper commingling" of funds controlled by the Whittington defendants. The Whittington defendants have cross-moved for summary judgment, unsurprisingly taking a contrary position as to both the scope of the policy and the applicability of the exclusion.

Having carefully considered the parties' submissions and heard oral argument, the court concludes that Ledyard's claim against the Whittington defendants arises from the conversion or misappropriation of funds under the Whittington defendants' control, and is therefore excluded under the unambiguous policy language. The court accordingly grants ALPS's motion for summary judgment, and denies the Whittington defendants' cross-motion.

## I. Applicable legal standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if it could reasonably be resolved in either party's favor at trial. See Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010) (citing Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009)). A fact is

"material" if it could sway the outcome under applicable law. Id. (citing Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)). In analyzing a summary judgment motion, the court "views all facts and draws all reasonable inferences in the light most favorable to the non-moving party." Id. On cross-motions for summary judgment, the court applies this standard to each party's motion separately. See, e.g., Am. Home Assurance Co. v. AGM Marine Contractors, Inc., 467 F.3d 810, 812 (1st Cir. 2006).

## II. **Background**

Defendant W.E. Whittington is a New Hampshire attorney who practices law under the name Whittington Law Associates, PLLC. Late on the evening of July 24, 2011, he received an e-mail from a person claiming to be Richard Downey, an attorney with the Law Offices of Richard L. Downey & Associates in Fairfax, Virginia. "Downey" wrote that he would be "sending a client over for a business litigation matter," and asked Whittington to "[a]dvise of [his] availability." Once Whittington had done so, the e-mail continued, "Downey" would "have [his] client contact [Whittington] directly with pertinent information." Whittington did not promptly respond to the e-mail, and late the following night, "Downey" wrote a second, identical e-mail to Whittington, sent from a different e-mail address.

The next morning, Whittington responded to the original e-mail, advising "Downey" that he was "completely available"; the morning after that, he responded to "Downey's" second e-mail, again advising of his availability. Several days later, "Downey" wrote back, informing Whittington that he had "forwarded your contact to my client to establish direct contact and provide pertinent information for your review." Shortly thereafter, Whittington received an e-mail from a person claiming to be Martin Joachim, a representative of Bendtsteel A/S in Frederiksvaerk, Denmark. "Joachim" advised that he had been referred by Richard Downey, and indicated that he would be forwarding additional information about "our legal matter."

In an e-mail to Whittington several days later, "Joachim" outlined the contours of this "legal matter." According to the e-mail, Mill Steel Supply of Manchester, New Hampshire had made only a part payment for "goods" supplied by Bendtsteel, with over $500,000 still outstanding. Bendtsteel wished to maintain its otherwise good relationship with Mill Steel Supply, but believed that the retention of the Whittington defendants "and the introduction of legal pressure may initiate immediate payment." "Joachim" continued:

> Our expectation of your services for now will be within
> the scenario of a phone call or demand letter to our

> customer.  This approach will trigger the much needed response from our customer towards payment.
>
> When all available options have been exhausted, litigation may be introduced as a last resort.  We will forward the pertinent document for your review.
>
> You may send your retainer document for the board to review as we intend to commence immediately.

After checking for conflicts of interest and conducting some internet research on Bendtsteel and Mill Steel Supply (both of which seemed, to Whittington, to be legitimate companies), Whittington advised "Joachim" via e-mail that he had no conflict of interest, and forwarded an engagement letter.  "Joachim" returned a signed copy of the engagement letter (again via e-mail), and informed Whittington that, after being notified of Bendtsteel's intention "to retain legal services as regards our claim," Mill Steel Supply had promised to make payment.  Following additional e-mail correspondence, "Joachim" informed Whittington that Mill Steel Supply had "made a part payment to you/your firm to avoid litigation," and that the payment would be sent directly to Whittington's office.

On August 31, 2011, Whittington received a UPS package containing a check in the amount of $195,790, purportedly issued by Citibank, N.A. on behalf of Mill Steel Supply and payable to Whittington Law.  He promptly notified "Joachim" of the receipt, asking whether "Joachim" wanted the funds wired to him and

proposing that the Whittington defendants keep $2,000 as a retainer. "Joachim" responded, agreeing to the $2,000 retainer and requesting that Whittington ask his bank "to transfer by swift to our creditor MS CAR FACTORY COMPANY LTD in CHIBA-KEN, JAPAN the sum of $188,978.000 (USD)." Wire transfer instructions were attached. The Whittington defendants immediately deposited the check into their client trust account at Ledyard National Bank, and requested that the bank wire the funds as directed by "Joachim."

Ledyard completed the transfer on September 6, 2011. Later that same day, Ledyard received notification that Citibank would not honor the check, and attempted--unsuccessfully--to recall the wire transfer. A subsequent investigation determined that the check was fraudulent, and that "Downey" and "Joachim" were fake identities (although Richard Downey and his law firm actually existed, his website had been hacked and the e-mail was not from the real Richard Downey).

Ledyard responded to this revelation by seizing the funds remaining in the Whittington defendants' client trust account to offset its loss. It also filed a state-court lawsuit against the Whittington defendants, seeking to recover the balance of the lost funds. The Whittington defendants duly reported the suit to ALPS, their professional liability insurer, requesting that ALPS

provide them with a defense against Ledyard's action. ALPS denied coverage and filed this declaratory judgment action.

**III. Analysis**

As is often true of insurance coverage disputes, this case does not involve any real disagreement as to the underlying facts. The outcome turns instead on the interpretation of the Whittington defendants' insurance policy, over which there is much disagreement. As noted at the outset, that disagreement concerns two clauses in particular. The first of these is the policy's coverage clause, which, in pertinent part, provides coverage for claims arising from or in connection with "an act, error or omission in professional services that were or should have been rendered by the Insured." Ins. Pol'y (document no. 18-7) at 2, § 1.1.1 (boldface omitted).[1] The second is one of the policy's multifarious exclusions, for claims arising from or in connection with the "conversion, misappropriation or improper commingling by any person" of client funds or funds "held or

---

[1]The policy pervasively deploys boldface type, using it for terms that are defined in the body of the policy itself, and also to emphasize certain passages of text. Instead of either copying each occurrence of boldface when quoting the policy or commenting on its omission, this order omits the boldface from any quoted portion of the policy.

controlled by an Insured in any capacity or under any authority." Id. at 8, § 3.1.13.

The parties' memoranda devote considerable attention to the first clause. ALPS, noting that the policy defines "professional services" to be "services or activities performed for others as an attorney in an attorney-client relationship," see id. at 6, § 2.22.1, argues that the policy does not provide any coverage because the Whittington defendants "did not have an attorney-client relationship with any actual client." Memo. in Supp. of ALPS's Mot. for Summ. J. (document no. 18-1) at 15. For their part, the Whittington defendants argue that an "actual client" is not necessary to an "attorney-client relationship," and that the only requirement is an attorney's "good faith belief . . . that he had entered into a legitimate attorney-client relationship." Memo. in Supp. of Defts.' Mot. for Summ. J. (document no. 21-1) at 12-13. Each side cites several cases involving similar facts in support of its favored interpretation.

While the interpretation of the first clause is interesting --particularly in light of the divergent results reached by the cases the parties cite[2]--this court need not resolve that issue.

---

[2]Compare Nardella Chong, P.A. v. Medmarc Cas. Ins. Co., 642 F.3d 941 (11th Cir. 2011) (losses due to Nigerian Check Scam arose from provision of professional services and were covered by attorney's professional liability insurance policy); Stark &

9

Assuming without deciding that Ledyard's claim against the Whittington defendants arises from or in connection with "an act, error or omission in professional services that were or should have been rendered by the Insured," such that the policy would ordinarily provide coverage against it under the first clause, that claim is excluded under the second clause.

The interpretation of insurance policy language is a question of law for the court. Concord Gen. Mut. Ins. Co. v. Doe, 161 N.H. 73, 75 (2010). "Insurers are free to contractually limit the extent of their liability through use of a policy exclusion." Progressive N. Ins. Co. v. Concord Gen. Mut. Ins. Co., 151 N.H. 649, 653 (2005). "Such language must be so clear, however, as to create no ambiguity that might affect the

---

Knoll Co., L.P.A. v. Proassurance Cas. Co., No. 12-cv-2669, 2013 WL 1411229 (N.D. Ohio Apr. 8, 2013) (same); O'Brien & Wolf, L.L.P. v. Liberty Ins. Underwriters Inc., No. 11-cv-3748, 2012 WL 3156802 (D. Minn. Aug. 3, 2012) (same); and Lombardi, Walsh, Wakeman, Harrison, Amodeo & Davenport, P.C. v. Amer. Guar. & Liab. Ins. Co., 924 N.Y.S.2d 201 (N.Y. App. Div. 2011) (same) with Bradford & Bradford, P.A. v. Attorneys Liab. Prot. Soc'y, Inc., No. 09-cv-2981, 2010 WL 4225907 (D.S.C. Oct. 20, 2010) (losses due to Nigerian Check Scam did not arise from provision of professional services and were not covered by attorney's professional liability insurance policy); Fidelity Bank v. Stapleton, No. 07A-11482-2 (Ga. State Ct. Jan. 14, 2009) (same); and Fleet Nat'l Bank v. Wolsky, No. 04-CV-5075 (Mass. Super. Ct. Dec. 6, 2006) (same). (In light of these cases, the court might need to reconsider its statement that this case "arises from a somewhat unusual set of facts, at least as far as professional liability insurance policies are concerned." Supra at 1.)

insured's reasonable expectations." Id. An ambiguity exists when, considering the exclusion "in its appropriate context, and constru[ing] the words used according to their plain, ordinary, and popular definitions . . . the parties may reasonably differ about the interpretation of the language." Id. The court ultimately "interpret[s] exclusion language to mean what a reasonable person would construe it to mean." Id.

In full, the relevant policy exclusion provides that

> THIS POLICY DOES NOT APPLY TO ANY CLAIM ARISING FROM OR IN CONNECTION WITH . . . [a]ny conversion, misappropriation or improper commingling by any person of client or trust account funds or property, or funds or property of any other person held or controlled by an Insured in any capacity or under any authority, including any loss or reduction in value of such funds or property.

Ins. Pol'y (document no. 18-7) at 8, § 3.1.13. As the Whittington defendants note, "this exclusion has apparently not been reviewed by any court in a reported decision." Memo. of Law in Supp. of Defts.' Mot. for Summ. J. (document no. 21-1) at 22. That is not, however, an obstacle to its application here, as its terms are clear and unambiguous as applied to the facts of this case. Ledyard's claim against the Whittington defendants arises from the scammer's misappropriation of the bank's funds, which the Whittingon defendants controlled, and thus falls squarely within this exclusion.

The Whittington defendants' arguments to the contrary are not persuasive.  In their memorandum in support of their motion for summary judgment, they focus solely on whether the misappropriated funds were "client or trust account funds or property," asserting that because Ledyard "is not seeking to recover" such funds and "[t]he $195,790 represented by the fraudulent check was simply never in the firm's [client trust] account . . . the exclusion by its own terms is inapplicable." Id.  By its own terms, though, the exclusion does not apply solely to the misappropriation of "client or trust account funds or property."  It also applies to the misappropriation of, simply, "funds" that are "held or controlled by an Insured in any capacity or under any authority."

Perhaps recognizing their oversight, in their opposition to ALPS's motion for summary judgment, the Whittington defendants assert that they "never actually held or controlled the money sent to [them] by Citibank" because "[t]he money represented by the $195,790 check that was purported to come from Citibank . . . never existed."  Defts.' Memo. in Supp. of Obj. to Pl.'s Mot. for Summ. J. (document no. 23-1) at 10.  Ledyard's action does not, however, arise from the scammer's misappropriation of the nonexistent funds "represented by the $195,790 check," so whether the Whittington defendants actually controlled those funds is

irrelevant. What is relevant is whether the Whittington defendants controlled the funds that were misappropriated, and which are the subject of Ledyard's claim against the Whittington defendants--the funds the Whittington defendants instructed Ledyard to wire to the Japanese bank account.

The Whittington defendants plainly controlled those funds, as their attorney conceded at oral argument. To "control" something, in the sense that term is used in the policy, means "to exercise restraining or directing influence over" or "to have power over." Webster's Third New International Dictionary 496 (2002). The Whittington defendants' "directing influence" or "power over" the funds in question is evident from the fact that the bank wired those funds at their direction.[3] Further, the clause refers to funds controlled by the Whittington defendants

---

[3] As ALPS notes, several courts have concluded that one exercises control over funds by directing that they be wired. See, e.g., Gould v. Georgia, 614 S.E.2d 252, 255 (Ga. Ct. App. 2005) ("[A]n individual can exercise control over funds by directing a wire transfer."); Bailey v. Texas, 885 S.W.2d 193, 199 (Tex. Ct. App. 1994) (defendant "exercised control over" bank funds by "orchestrat[ing] a wire transfer" from one account to another). The Whittington defendants assert that these cases are inapposite because they "have absolutely nothing at all to do with insurance" and "involve the theft of 'real' money," not "a counterfeit check or the wiring of funds that did not exist." Defts.' Reply (document no. 25) at 6. This argument--which rather flippantly ignores the fact that this case also involves "the theft of 'real' money" from the bank and its depositors-- does not diminish these cases' instructive value as to the plain and ordinary meaning of the term "control."

"in any capacity or under any authority," a clause broad enough to encompass the Whittington defendants' status as account holders at Ledyard. Indeed, the Whittington defendants' authority, as account holders, to direct the bank how to disperse the funds at issue was the linchpin on which the scam itself turned; if the Whittington defendants had no such authority, the scam could not have been accomplished.

The Whittington defendants also argue that the exclusion is ambiguous because ALPS could have included additional language in the policy to exclude claims "arising out of, in connection with, or in consequence of . . . the dishonoring of any financial instrument." Defts.' Memo. in Supp. of Obj. to Pl.'s Mot. for Summ. J. (document no. 23-1) at 11 (quoting Chicago Title Ins. Co. v. Northland Ins. Co., 31 So. 3d 214, 215 n.1 (Fla. Dist. Ct. App. 2010)) (emphasis omitted); see also Defts.' Reply (document no. 25) at 7. Determining whether a policy exclusion is ambiguous, though, does not turn on whether the insurer might have included another, more precise exclusion. As already discussed, ambiguity turns instead on whether "the parties may reasonably differ about the interpretation of the language" of the exclusion that was actually included in the policy. Concord Gen. Mut. Ins., 151 N.H. at 653. And, for the reasons already

discussed, the parties can not "reasonably differ" as to whether Ledyard's claim falls within the scope of § 3.1.13's exclusion.[4]

As a last resort, in their reply brief, the Whittington defendants argue that the language of § 3.1.13 quoted above does not apply at all, and that a version of the exclusion that ALPS promulgated in August 2011 applies instead. This position directly contradicts the position the Whittington defendants take in their memorandum in support of their motion for summary judgment, in which they rely upon the same version of § 3.1.13 quoted above. See Memo. in Supp. of Defts.' Mot. for Summ. J. (document no. 21-1) at 21-22. This court ordinarily does not consider arguments made for the first time in reply, see Doe v. Friendfinder Network, Inc., 540 F. Supp. 2d 288, 303 n.16 (D.N.H. 2008), a practice that is even more sensible when a party's tardily-contrived arguments are in conflict with its own earlier arguments, see Beane v. Beane, 856 F. Supp. 2d 280, 298 (D.N.H. 2012). The court also does not, for that matter, consider inadmissible evidence on summary judgment, see, e.g., Elmo v.

---

[4] At oral argument, the Whittington defendants argued that the exclusion was ambiguous as actually written, contending that the parties could reasonably differ as to whether the term "any person" referred only to persons employed by or acting on behalf of an Insured. This argument was not presented in any of the Whittington defendants' memoranda and is untimely. See Johnson v. Gen. Dynamics Info. Tech, Inc., 675 F. Supp. 2d 236, 241 n.3 (D.N.H. 2009). It is also unpersuasive.

15

Callahan, 2012 DNH 144 at 18, and the "new" version of § 3.1.13 upon which the Whittington defendants rely is unauthenticated and hence inadmissible, see Fed. R. Evid. 901(a).

The new version of the exclusion does not help the Whittington defendants in any event. That version excludes claims arising out of or in connection with "[a]ny conversion, misappropriation, improper commingling or negligent supervision of client or trust account funds or property, or funds or property of any other person held or controlled by an Insured in any capacity or under any authority, . . . ." Revised Ins. Pol'y (document no. 25-1) at 8, § 3.1.13. The removal of the phrase "by any person," the Whittington defendants argue, makes it "clear that the bad or negligent act must be done by the insured." Defts.' Reply (document no. 25) at 7 (emphasis in original). Reading the exclusion "in its appropriate context," Concord Gen. Mut. Ins., 151 N.H. at 653, though, it is apparent that the revision worked no such change.

When the policy excludes coverage for claims arising from the insured's acts, it includes a specific limitation to that effect. By way of example, the policy contains exclusions for claims arising from or in connection with:

> An Insured's activities as an elected public official
> or as an employee of a governmental body, subdivision,
> or agency thereof; . . .

16

> <u>An Insured's</u> activities or capacity as a fiduciary under the Employee Retirement Income Security Act of 1974, as amended, or any regulation or order issued pursuant thereto; . . .
>
> Alleged discrimination <u>by an Insured</u>, including discrimination based on race, color, creed, age, sex, nationality, marital status or sexual orientation;
>
> Alleged sexual harassment or misconduct <u>by an Insured</u>;
>
> <u>An Insured's</u> rendering of investment advice to any person, including but not limited to advice concerning securities, real property, commodities or franchises; [and]
>
> <u>An Insured's</u> services or capacity as a broker, dealer, investment advisor, business manager, accountant, real estate broker or real estate agent[.]

Revised Ins. Pol'y (document no. 25-1) at 7-8 (section numbers omitted; emphasis added); <u>see also</u> Ins. Pol'y (document no. 18-7) at 6-8 (using the same or similar language). So the very fact that the exclusion set forth in § 3.1.13 is not limited to "<u>an Insured's</u> conversion, misappropriation, improper commingling or negligent supervision" or "conversion, misappropriation, improper commingling or negligent supervision <u>by an Insured</u>" is enough to set it apart from its confederates, and to make clear to any reasonable person that the "bad or negligent act" need <u>not</u> be done by the insured. The phrase "by any person" was surplusage,

17

and its deletion made no change to the substance of the exclusion.[5]

The Whittington defendants finally protest that "no law firm purchasing professional liability insurance would expect that permitting its client trust account to be pilfered would not be covered."[6] Defts.' Reply (document no. 25) at 9 (quoting O'Brien & Wolf, 2012 WL 3156802 at *8). It suffices to say in response that if the plain and unambiguous language of the insurance policy excludes coverage for those acts, the insured law firm should expect just that. That is the case here, and ALPS is entitled to summary judgment in its favor.

---

[5]The Whittington defendants also argue that the addition of "negligent supervision" to § 3.1.13 (which, they say, does not bind them) "highlights the ambiguity in the original exclusion" by demonstrating that the earlier version did not exclude claims arising from negligence of the type alleged in Ledyard's suit against them. Defts.' Reply (document no. 25) at 8. But, as already discussed, in reviewing policy language for ambiguity, this court reviews the language of the policy as it was actually written and does not speculate about how it might have been written.

[6]This protestation, it bears noting, is in tension with the Whittington defendants' argument--discussed above--that the "pilfered" funds were not in their client trust account.

**IV. Conclusion**

For the foregoing reasons, ALPS's motion for summary judgment[7] is GRANTED, and the Whittington defendants' motion for summary judgment[8] is DENIED. The clerk shall enter judgment accordingly and close the case.[9]

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated: June 28, 2013

cc: William L. Boesch, Esq.
    Gordon A. Rehnborg, Jr., Esq.
    R. Matthew Cairns, Esq.

---

[7]Document no. 18.

[8]Document no. 21.

[9]As a member of the bar of this court, ALPS's counsel is expected to be familiar with and observe the local rules of this court. Counsel is reminded that pursuant to Local Rule 5.1(a), "[f]ootnotes shall be used sparingly." In spite of this rule, every citation to the record or to authority in ALPS's legal memoranda is contained in a footnote, begetting around 150 footnotes total. Counsel would do well to temper his use of footnotes in the future.